Good morning, Your Honor. Sandy Svetka from the Robbins Geller firm in San Francisco representing the pension fund, the plaintiff-appellant. In this case, I'd like to reserve three minutes for rebuttal. The district court dismissed the pension fund's securities complaint. This is not an immigration case, Your Honors. With respect, we submit that the matrix decisions both in this court and in the U.S. Supreme Court require reversal. The district court did not have the benefit of the U.S. Supreme Court decision at the time it ruled. It did have this case. It cited this case, the matrix, the Ninth Circuit case for the elements of a securities fraud action, but then did not go on to use the Ninth Circuit's matrix decision in analyzing either materiality or scienter, which are the principal issues in the case. Our submission is that if the district court had applied this court's decision in matrix, and certainly after the U.S. Supreme Court's decision in matrix, that it could not have reached the rulings that it did. And I'd like to walk you through, you know, you can say it's easy for you to say, Mr. Svetka, that matrix requires reversal, but how does that happen? Well, let's go through the three rulings that are in play. First, the district court said that disagreements over study design and statistical analysis are insufficient to allege a materially false statement. That's at page 14 of the record excerpts. But matrix, in this Court, holds the very opposite. It says statistical analysis are fact disputes for a trier of fact. And in a summary judgment context, even if the defense had submitted an expert, our complaint is based on a statistics expert who is undisputed at this stage. But even if they had an expert, there would be a disputed issue of fact that would get passed emotionally. Make sure I understand this particular point. Okay. Because one way you could look at this is, as the district court did, which is you're offering a different statistical approach or methodology. The other is that what the district court was saying is you don't seem to contend that the statistical analysis that they did was fraudulent. Well, that's not quite right. Explain to me. Yeah, let's back up a second. Yeah, so explain to me. We allege the following, that the claims of efficacy for the drug are false, that the statistical P values that are noted in the press release are false because the evidence is false, and the statistical analysis is false because of the data. I'm sorry. Are you saying that they had to use, that the methodology that they used, that they manipulated the data? Yes. Yes. That's what Professor Block said, that they had used correct basic statistics. If they had. That's different. No, he said that. No, no, but using the correct statistical, it's his opinion that they should have used a different statistical approach. And the approach they used was the wrong approach, given the information that they were dealing with, that they did not take account of the fact that there were different results in two different countries. They combined the results and announced combined results, and then 10 months later said, oops, there are actually different results in the different countries, and by the way, we knew about it from the beginning, and we asked that it be studied. And then they reported it 10 months later. So they, in effect, concede that there was a problem with the fact that they, the data, they manipulated the data by combining it, never disclosing that there were separate data. Is that an improper statistical methodology to use? Well, Professor Block included that, yes. He said part of his statistical analysis was that by combining the country data and not disclosing that there were separate results in the two countries that were material, that that was an incorrect statistical approach. That was part of it. He had three different reasons. But isn't there a difference between an incorrect approach and one that is allegedly they've done with knowing intent to deceive? Well, they took the incorrect approach and announced false results, misleading results. So, yes, they used an incorrect statistical model and then proceeded to present to the public incorrect results based on that model. That's fraud. Okay. In other words, I think Your Honor is thinking that the statistical model itself has to be fraudulent, not simply incorrect. I think if it's incorrect and then they announce a fraudulent and make a fraudulent public statement based on that incorrect analysis, the fraud is in the statement to the public. It's not in the numbers game. But they use the numbers game to present a false picture to the public, to the investing public. So, to go back, the disputes over statistical analysis are fact questions. Ultimately, they can present an expert and dispute it. Maybe on summary judgment there would be disputed experts, but we'd still get the trial. So I think on the materiality point, on efficacy, we get past the motion to dismiss. On the side effects, the judge ruled at page 15 and 16 that the company disclosed moderate or greater severity as the key safety results. Well, there are three, and that does not mean that the first group of statements were misleading because they announced additional side effects later. But that's not what Matrix holds. Matrix says withholding adverse events is an extreme departure from the standard of ordinary care. Once you speak on safety, you must speak fully so as not to mislead about known side effects. And who says moderate or severe is the standard? That's just another way of saying statistical significance, which is what Matrix threw out as a bright-line rule. So the district court didn't get to use a different bright-line rule. So for all of those reasons, the district court is wrong on the side effects. So how much more should they have disclosed, and what else should they have disclosed? Well, first, the major thing is the blood pressure. They said that there was no blood pressure problem initially. They talked about the fact that moderate hypertension was quite low. That's what they said in December. On July 23, 1909, they said about a later test that hypertension was one of the most clinically meaningful problems, side effects found in a later test, just as we found as was found in the earlier test. So now in July 2009, and this, by the way, is at ER 53, paragraph 93, they are saying hypertension was a problem back in December. And the analysts picked up on that. The analysts recognized at first, the analysts thought there doesn't seem to be a problem with blood pressure and hypertension. And then suddenly in October they're saying, wow, there's a steep dose-dependent increase in average blood pressure, which creates regulatory, commercial, and clinical risks. Well, that's a significant change in the facts. And the facts about blood pressure were known in December. Now, let's go to Santer, which is key. The district court ruled at page 17 and 18 that there was no document or witness contradicting defendant's statements. Well, there was, first of all, that kind of smoking gun evidence is not required under tele-abs. But in this case, unusually, we have two smoking guns. Dr. Grossbart, the chief medical officer, said, I was concerned about the side effects. I was concerned about the country interaction, and I asked it to be studied before the study was unblinded. And, in fact, there was one. We found one. So he knew it at the outset. And then he wrote about it in the article that he published in October. But he started that article back in December. He submitted it in April. So they knew about it, the country effect, all the time. And if you think about it, if they were concerned about a country effect, Judge Paez, they had to study it. Because if they were concerned about it and didn't study it, they would be intentionally false. And if they closed their eyes to it, they'd be deliberately reckless. Either way, that's fraud. Why is the country effect interaction significant? Well, the country interaction was represented to have a good efficacy effect in the combined study. Yes. And among the things that were noted was that as the dose increased, you get better results. Yes. And much better than placebo. It turns out that the placebo effect in Mexico at 55 percent was better than any result at any dose in the United States. It was 33, 55, and 40 at 50, 100, and 150 mg. So there was not, as you increased the dose, a better result. And, in fact, the placebo was better than the actual dose. So for both of those reasons, the country effect was very material. And they concealed it. Okay. So we have the admission by Grosbar that he was concerned about it, asked to have it studied, and that they found out about it at the time. And then we have the article describing all that and laying it out. Those are smoking guns. That's not all we have. This is the time. Didn't the article come later, about six months later? It's 10 months later. It came 10 months later, but it was submitted in April of 2008. In other words, they spoke falsely in December. He said he had the data and asked that it be studied for country effect at the time of the study. They speak about the study, never mentioning the country effect, yet they know about it. They submit the article for publication describing the country effect in April, and it's not published until November. So they hide the ball for 11 months. Now, what happened during that 11 months? Well, here's a company that's insolvent. It needs cash desperately. It's a one-trick pony. It's got one flagship product by their own description, 159 employees, five executives. Everybody knows what's going on in this company. The core business inference here applies in spades. And the motive is $135 million in the offering. That's a huge motive. They had to raise that money to survive as a company. This was their flagship product. So you have an admission, you have an article, you have the core business inference, you have a monetary motive. This is a solid case for CNTR. I only have three minutes left on the clock, and I'll save my time. That's fine. May it please the Court, good morning. My name is John Dwyer from Cooley LLP. I'm here on behalf of Riesl Pharmaceuticals and the individually named defendant appellees. With me at the table is Jerry Marks, who represents the underwriter defendants. Mr. Marks has ceded his time to me this morning. I'm going to address many of the arguments that counsel just raised. And one of the themes is that not only do I think I can demonstrate to you that he is misinterpreting Matrix and its applicability to this case, but much of the force of his argument comes from actually a misunderstanding of what the record actually reflects. He indicated that with regard to the P values, the first question the Court raised, that there are allegations that the numbers somehow, or it was a little bit unclear to me, that the numbers somehow were manipulated, and those allegations are in the complaint. They do not exist in the complaint, Your Honor. There's no allegation in the complaint that the data that was pulled together was manipulated, that it was false. There's no allegation that the P value calculated using the Pearson's chi-square methodology was incorrectly calculated. There's no allegation that the company calculated a P value and didn't like it and came up with a different formula to try to get another P value. That's what happened in the Harkinen case, which was a criminal case. It's different. But in that case, Judge Patel looked at the situation and said, you know what, when you're looking at statistics, the FDA, you should defer a little bit to the FDA, and the FDA requires companies to agree to a standard protocol before they enter into the trials. The reason for that is so they can't manipulate the data or manipulate the process as it's going forward. In the Harkinen case, he was convicted of mail fraud in large part because what they did at the end of the trial was they got the data, they didn't like the results, they manipulated it until they found something that they liked. That's not the allegation here. The allegation here really is what Your Honor suggested at the very beginning, that they would have used a different methodology. Their methodology, I don't really understand it, but they say the numbers should have been split, they should have used the Fisher's exact method, they should have been combined using a different Fisher's method, and then there should have been an overlay using something called 2K studentized key index. It's over my head. It's over my head. But, Your Honor, the last thing this Court wants to do is to make the rule of law hostage to debates among statisticians. This is nothing more than at most a good-faith dispute between plaintiff statistician and our statistician and the FDA and the company and the numbers that the company generated here. Well, how do you respond to his arguing that you combined the data from Mexico and from the United States and that that, by doing that, you were able to manipulate the results? So, first of all, there is no allegation. I don't think anybody would seriously suggest that by reporting the cumulative data that the company did anything wrong or that those numbers were wrong. If you look at almost every clinical trial, the data is reported cumulatively. So there's nothing inherently wrong there. They refer to the record. Now, I hope the Court looks closely at the record on some of these disputed issues because there are several that I want to raise this morning. But they talk about the allegation that Dr. Grossbart said that back at the time the data was unblinded, he was concerned there was a country interaction and he saw that there was a country effect and that, nevertheless, the company simply released the cumulative data. A couple points there. What he says. That's accurate. But basically what he says is we looked at it. Excuse me, Counsel. Is what we're talking about, is the adequacy of the allegations in the complaint? It's not a summary judgment. It's a dismissal for the inadequacy of the allegations in the complaint. That's correct, Your Honor. With the standard motion to dismiss, standard of review that's set forth for PSLRA cases. So I'm confused. Some of the argument seems to be whether the actual facts were something or other, as opposed to what was in the complaint and whether that is accurate and whether that's sufficient. Your Honor, so what is in the complaint, as well as the record that is subject to judicial notice, both things were considered by the court, by the district court, is the statement. And that statement in excellence by Dr. Grossbart was we looked at the countries and there was no issue. And the real issue in all of this is that when you look at the data cumulatively or if you look at it separated, what you see is that the patient populations improved their ACR 20 scores, which was the scientific measurement, improved by roughly the same numbers, about 20 to 25 percent. There's no question that the drug was efficacious in the United States, the drug was efficacious in Mexico, and the drug was efficacious cumulatively. And when you split those numbers apart, that's what you actually see. You know, this is a kind of a case, if you boil it right down, your company has to raise capital to survive. And the question is whether they have lost the facts too much to raise the capital. And that's where it's at. Why don't you take each of their contentions as to what was said that they claimed to be false and tell us why it isn't? Right. So, Your Honor, that is where their complaint fails, which is they need to allege not just the information was material, but the omitted information rendered a statement that was made misleading or false. With regard to the country interaction, the fact that we didn't split the data apart does not mean that the cumulative data was false. It showed an efficacy based upon the protocol, by the way, that FDA had approved ahead of time. There's no allegation, for example, that the FDA required, there's reference to guidance in an FDA manual, but that's it. Secondly, they talked about the safety data. And, again, basically the company made a determination about when it disclosed the information in December 2000, it was trying to act as a prudent corporate citizen. It needed to get this information out quickly, because it was clearly relevant, the result of this drug trial. What did they disclose? They disclosed the top line results. That is, that it was efficacious based upon the protocol approved by the FDA, and also here were the key safety results. There's no question that requires some judgment as to what the key safety results were, but they made a determination, and they clearly articulated. There's a, I don't know if you've had a chance to look at it, there's a table in the press release, and it says exactly what's being disclosed. It's key safety results, and it says, for example, for elevated liver enzymes, it's not all elevated liver enzymes, it's only those enzymes were three times the upper limit of normal. It clearly sets that up. Nobody could read that and think that everything was being disclosed. And that basic analysis is true with regard to all of the safety data. Now, that's not where the judgment ends, Your Honor. Companies constantly need to exercise judgment here. In the article that came out in Arthritis and Rheumatism magazine a year later, that's not. In there, the company again needed to make some, or the authors needed to make some determinations about what to include and what not to include. When this drug is ultimately submitted to the FDA for approval, if it gets there, the company will probably submit 500,000 to a million pages of data to the FDA. Obviously, throughout that entire process, there are determinations being made. So the fundamental failure, Your Honor, is that each of the statements that they allege, with the exception of the P-value, and I'll come back to the P-value, but with regard to all of the other statements, they don't really allege that they were false. They basically say that the statements that were made were misleading because this information was not included. And they have not provided any reason, and under 9B in the PSLRA, it's their obligation to articulate why it's false. And simply to say that there were 10 more people that had moderate GI effects, when we had disclosed that there were 10 people, I don't know what the numbers are, that there were 10 people with severe GI side effects, is not sufficient. We clearly disclosed all of the risks. Let me back up for one second. In December of 2007, the company issued the top-line results. The question really for this Court is, what did they project at that point in time to the public, to the investment community? And what they projected was the following. The trial had been successful. The Phase 2A trial had been successful. We had reached efficacy on the key factor, which was ACR 20. There were safety issues. We thought they weren't too bad, but there were safety issues, and here were the most severe ones. Hypertension of moderate to severe, neutropenia, et cetera, and that before this drug was ever going to be commercialized, there were a lot more studies to be done. That's what they said in December 2007. In October 2008, the profile of this drug is exactly the same. If you look at all of that, there's still an efficacious drug. Now you know it was efficacious cumulatively. You also now know it was efficacious when you broke the data down by country. And you also had the same safety results. You now knew there were some more additional ones. So let me mention just briefly MATRIX, because I believe counsel misunderstands a little bit the holding in MATRIX. You're talking about the Supreme Court's recent decision? The Supreme Court's decision. The Supreme Court basically said the core holding in that case was we are not going to impose a bright-line rule that says adverse events are material only if they arise to the level of statistical significance. That was the holding. I don't think that that drives the result in this case. First of all, nobody has alleged that the less severe side effects, the more mild side effects, should have been disclosed because they were statistically significant. Nobody said that. In fact, we've never said they shouldn't be disclosed because they weren't statistically significant. In fact, nobody says that the information that was disclosed was statistically significant. None of that applies. Nobody is trying to hide behind that bright line. The second half of the MATRIX decision that I think is instructive. And in that situation, the courts, after saying we're not going to automatically rule this is not material, they then looked at what had been disclosed. And they compared what had been disclosed to what had been omitted. And basically what they said, based upon that record, was this company, MATRIX, knew that its cold remedy called Zycam had at least raised serious questions about whether or not it was causing a disease called anosmia, which is a loss of smell. They had a lot of people. They had lawsuits. They had physicians telling them. They had universities telling them that. They never disclosed it. And, in fact, when it started trickling out on Good Morning America, what the company did is they panicked. And they issued a release and said there's no clinical proof that suggests that there's any relationship. And that's what the court said. The court said, importantly, when you look at what the company said and you look at what the information was that was omitted, it was misleading. It's very different here. In this case, there's no question that the drug was efficacious, number one, and there's no question that we disclosed the rest. They may have wanted us to disclose additional risk, but at most they've shown, at most, that our disclosures are not complete or as complete as they would like. But the securities laws require a lot more in order to state a claim. There's one issue with regard to the record that I just want to make sure that I get in, and that relates to the statement related to Paragraph 93 of the complaint to Senate ER 53. And counsel suggested that that showed that a later study showed two things. One, that later studies of the drug showed it was not efficacious, and two, that the company later admitted that hypertension was one of the most clinical, meaningful side effects from this 2007 study. And I just want to draw the court's attention to it very briefly because it's very important. When you look at that quote from Paragraph 93, it's a quote dated press release from July 23, 2009, and the quote is similar to, and then they insert the Phase 2A study, the most common clinically meaningful effect was, and then they refer to the Phase 2B study. Your Honor, this is the press release we asked the court in our briefs to take judicial notice of, because if you look at that press release, both statements that counsel made absolutely are false and aren't supported by the record. First, what it actually says is similar to the TASCII 2 study. The TASCII 2 study, that's what the press release says, is not the Phase 2A study that's at issue in this case. And you can satisfy yourself of that fact by just reading to the end of that press release. At the end of that press release, it says the TASCII 2 study was a study whose data was released earlier in July of 2009. So there's two very important points there. One, we never have said, in retrospect, hypertension was a bigger deal coming out of the 2A study than we thought. And number two, it's just absolutely not true that there was a study in this patient population, and this patient population is people with active rheumatoid arthritis despite being treated on methotrexate. There's no evidence that the direct has not been efficacious with that group. This study involved a different patient population. All right. Finally, Your Honor, in closing, I just have 30 seconds. I think there's probably one other fact that distinguishes this case from probably every case cited by appellant's counsel, and that is R-788, Rigel's drug, is not a failed drug. It is still in clinical trials. It's still in clinical trials for this patient population. It's now in phase three trials. It, at least up to this point, is a success. The company's never promised it's going to get approval, but so far it has been a successful drug. It still holds out promise for people suffering from moderate to severe rheumatoid arthritis. Okay. Thank you. Mr. Sackoff, you have a few minutes in rebuttal. Mr. Dwyer suggests that there was no difference between what was announced in terms of efficacy and side effects in December and in October. Let's start with the stock price. The investors thought differently. The stock price went down 38 percent, and it went down 38 percent not for no reason at all, but because of the differences that the analysts noted. Look, the response data by country was announced for the first time on 10-2708, ER-45, paragraph 72. The ‑‑ That's about ten months later. Ten months later, right. The first time the country effect is noted. The country effect showed a higher placebo effect in Mexico than any dose response in the United States. Not known in December. Only for the first time in October. Safety profile. The analysts said the safety profile is not as benign as it was cracked up to be in December. There's a steep dose‑dependent hypertension effect, whereas earlier they said don't worry about blood pressure and hypertension. Only two cases noted. It turned out there were five such cases. There was an average increase in hypertension across all dosages. There were significant differences. The liver elevations, only three announced in December. There were three times that many, nine in October. Gastrointestinal effects, diarrhea, 15 cases in December. 35 out of 189 patients. That's a huge number. There were significant differences in the two announcements. The analysts noted it, and the market price reflected it. That reflects that there is not just simply incomplete. That's when the price dropped? That's when the price dropped. It's not simply incomplete. It was misleading. The analysts believed something different in December than they announced in October. That's misleading. And that is sufficient to get past the bar on materiality and C‑Enter, given the facts of the case. Now, Mr. Dwyer said there was just a good faith dispute between experts. Wait a minute. What expert did they offer? We're the only one who offered an expert. And that's ‑‑ Breyer. But you're not supposed to try these cases on me. Exactly. This is a complaint. That's exactly the point. But you're ‑‑ you alleged that their statements were false.  And that they knew they were false.  And then you try to point that out by saying this is what they should have done. Exactly. And we explain why they were false. We use the expert to explain it. Now, they say, well, the expert is just a good faith dispute. That's the whole point. A good faith dispute doesn't get decided on a motion to dismiss. It gets ‑‑ it doesn't get decided on a summary judgment. It's for trial. That's why we get past the MPD in this case. Okay. Thank you, Your Honor. All right. Thank you, counsel. It's an interesting case. We appreciate your arguments. The matter is submitted.
judges: Hug, Fletcher, Paez